UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
UNITED STATES OF AMERICA,    :
                             :
       v.                    :    **AMENDED MEMORANDUM**
                             :    **AND ORDER**
                             :    21-CR-564 (WFK)
HERSHEL TSIKMAN,             :
                             :
                Defendant.   :
-----------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

On September 27, 2024, Hershel Tsikman[1] ("Defendant") pled guilty to one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, to wit, a violation of 18 U.S.C. § 1347. Plea Agreement (the "Plea") ¶ 1, ECF No. 374.[2] The Court now sentences Defendant and provides a complete statement of reasons, under 18 U.S.C. § 3553(c), of those factors set forth by Congress in 18 U.S.C. § 3553(a). For the reasons set forth below, Defendant is hereby sentenced to 120 months' incarceration; two (2) years of supervised release with both the standard and special conditions of supervision; mandatory restitution in accordance with the forthcoming Order of Restitution; and a $100.00 mandatory special assessment.

## I.    Background

### A. Factual Background

From April 2017 through March 2022, Defendant conspired with others "to execute a scheme and artifice to defraud one or more health care benefit programs[.]" Presentence Investigation Rep. (the "PSR") ¶ 1, ECF No. 405. To carry out the scheme, Defendant, Brian Michael Sutton, ("Sutton"), Brycen Kay Millett ("Millett"), Joshua Manuel Alegria ("Alegria"), Anthony Santamaria ("Santamaria"), Hafizullah Ebady ("Ebady," together with Defendant, Sutton, Millet, Alegria, and Santamaria, "Defendants"), Dela Saidazim ("Saidazim"),

---

[1] Defendant is also known as "Andre Miller," "Andrew M.," "Linus Caldwell," "Jonathan Martin," "H," and "Schmeckel." Third Superseding Indictment (the "Indictment") at 1, ECF No. 241; Presentence Investigation Rep. (the "PSR") ¶ 9; Second Add. to PSR at 1, ECF No. 431 (striking an alias thought to have been used by Defendant).

[2] Citations are to the docket in *United States v. Ebady, et al.*, 21-CR-564. Page pincites refer to the ECF page numbers assigned to a filing where available, and where no ECF heading is present, to the page numbers listed in the original filing.

1

and David Gary Bishoff ("Bishoff") "fraudulently bill[ed] private health care benefit programs (the 'Private Insurers') for fraudulent telemedicine prescriptions and . . . launder[ed] the proceeds of the scheme." *Id.* ¶ 13.

The scheme "involved over 50 pharmacies." *Id.* ¶ 12. "First, Bishoff and Millet used Call Centers" located in numerous locations around the globe—including the United States and Russia—to call "individuals enrolled in the Private Insurers . . . offer[ing] medications at no cost [and] without any medical exams to determine the medical necessity for those medications." *Id.* ¶ 13.

Second, Saidazim and others "recruited licensed physicians and generated fraudulent prescriptions for [the enrolled individuals] under the physicians' National Provider Identifier (NPI) codes" often "without their authorization." *Id.* ¶ 14. These fraudulent prescriptions would also be generated regardless of whether or not the enrolled individuals agreed to receive any medications. *See id.* ¶ 13.

Finally, Ebady "locate[d] . . . brick and mortar pharmacies . . . with pre-existing pharmacy board registrations and insurance relationships with the Private Insurers (the 'Scheme Pharmacies')" and "negotiate[d] [their] purchase . . . by straw buyers and direct[ed] their day-to-day operations." *Id.* ¶ 15. Through these efforts, Defendants, Saidazim, and Bishoff were able to "conceal the true ownership and control of the Scheme Pharmacies from the Private Insurers in order to delay discovery of the fraud and maximize their illicit gains before the Private Insurers stopped reimbursing the Scheme Pharmacies." *Id.* The scheme resulted in the scheme participants "own[ing], control[ing], and operat[ing], directly and indirectly, more than 50 Scheme Pharmacies across the United States[.]" *Id.* ¶ 16.

Defendant was specifically responsible for "coordinat[ing] the laundering of the criminally derived proceeds and direct[ing] the transfer of funds to and through various straw owners and shell entities."[3] *Id.* ¶ 26. "[Defendant] wired, or caused the wire of, criminal proceeds from the United States to bank accounts in China[]" and to the participants of the fraudulent scheme.[4] *Id.* Overall, Defendant is estimated to have been "involved in financial transactions of the purchase and management of at least 28 Scheme Pharmacies." *Id.* For just twenty-four of these pharmacies, "[t]hird-party billing records show . . . the scheme submitted more than $989 million in claims to Private Insurers and was paid over $277 million."[5] *Id.* Nevertheless, Defendant "did not lead, supervise or manage any other criminal participants." *Id.* ¶ 27.

As a result of the scheme, Private Insurers lost hundreds of millions of dollars they paid in fraudulently obtained reimbursements prior to ending their business relationships with the

---

[3] Defense counsel objects to the characterization of Defendant's involvement in the fraudulent scheme. *See* Second Add. to PSR at 2, ECF No. 431 (Summarizing Defendant's objection to PSR ¶ 26). Specifically, defense counsel disagrees Defendant "*coordinated* money laundering and *directed* the transfer of funds," asserting he instead "acted in the direction of others at all times . . ." Second Add. to PSR at 2 (quotation marks omitted and emphasis added). It is further asserted "[Defendant] had no involvement in the billing, collection, or audit process[]" and only "execut[ed] payments on his computer to direct the funds in the pharmacy's bank accounts when and as he was told." Def.'s Mot. to File under Seal ("Def.'s Sent'g Mem.") at 11, ECF No. 476. The U.S. Probation Office ("Probation") declined to amend this characterization, finding it is "accurate as written" and given it does not affect Defendant's sentencing analysis. *See* Second Add. to PSR at 2.

[4] *See supra* Part I n.3.

[5] Defense counsel objects to the Government's calculations of loss articulated in the PSR. *See* Second Add. to PSR at l, 3 (Probation recounts Defendant's objections to PSR ¶¶ 25, 26, 36, 41, and 99); *see infra* Part III(D). Among other reasons, defense counsel believes reliance on DigitalRx remote billing software data is misguided because "the data does not purport to reflect actual payments and reflects only preliminary responses from payers as to whether a claim is payable." Second Add. to PSR at 1. The Government disagrees, *see generally* Gov't Sent'g Mem., ECF No. 485, and Probation declined to amend the DigitalRx estimates unless the Court makes a particular finding based upon evidence presented at a hearing pursuant to *United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978) and 603 F.2d 1053 (2d Cir. 1979). *See* Second Add. to PSR at 1, 3.

3

Scheme Pharmacies. *See id.* ¶ 21. The money paid out by the Private Insurers was transferred offshore and concealed by Defendants, Saidazim, and Bishoff before the Private Insurers discovered the fraud. *See id.* Records from the remote billing software show that between April 2017 and March 2022, "[Defendants] and their co-conspirators caused the submission of over $1.7 billion in reimbursement requests to be submitted to Private Insurers and that the Private Insurers paid over $500 million as a result of the fraudulent submission."[6] *Id.* ¶ 25.

**B. Procedural History**

On June 7, 2021, the United States filed a then-sealed complaint against Ebady and Saidazim, alleging their participation in the above-mentioned scheme. ECF No. 2. A similar complaint was filed against Bishoff and Millet on March 7, 2022. ECF No. 1.

On November 8, 2021, a U.S. Grand Jury returned a two-count indictment against Ebady and Saidazim. ECF No. 29. On August 5, 2022, a U.S. Grand Jury returned a two-count superseding indictment (the "First Superseding Indictment") against Ebady, Saidazim, Bishoff, and Millet. ECF No. 92. On February 16, 2023, Saidazim waived indictment and the Government filed a single-count superseding information against her. ECF Nos. 154, 155.

On November 3, 2023, a U.S. Grand Jury returned a three-count third superseding indictment against Defendants (the "Indictment"). *See generally* Indictment, ECF No. 241. Shortly after the Indictment was filed, Defendant was arrested in the Central District of California on November 7, 2023. *See* PSR ¶ 26. The Indictment charged Defendants with the following: Count One alleged conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349; Count Two alleged health care fraud in violation of 18 U.S.C. § 1347; and Count Three alleged conspiracy to money launder in violation of 18 U.S.C. § 1956(h). *See* Indictment ¶¶ 26–

---

[6] *See supra* Part I n.5.

31. The Indictment also raised criminal forfeiture allegations pertaining to all Counts. *See id.* ¶¶ 32–35.

On September 27, 2024, Defendant pled guilty to Count One of the Indictment. *See* Plea ¶ 1; *see also* Indictment ¶¶ 26–27. Pursuant to the Plea, Defendant agreed not to file an appeal or otherwise challenge his sentence if the Court imposes a term of 120 months' incarceration or below. *See* Plea ¶ 4. The Government further agreed "[n]o further criminal charges [would] be brought against [Defendant] for his participation in criminal activity involving healthcare fraud, related money laundering and conspiring to commit the same as alleged in the [Indictment], all from the period April 2017 through March 2022[.]" *Id.* ¶ 5(a). Additionally, the Government agreed to dismiss the remaining counts of the Indictment and any underling indictments with prejudice as to Defendant at the time of sentencing. *See id.*

On February 16, 2023, Saidazim pled guilty to the sole count of the superseding information pursuant to a written plea agreement, charging her with conspiracy to commit health care fraud in violation of 18 U.S.C. § 371. *See* Saidaizim Plea Agreement ¶ 1, ECF No. 153. On December 13, 2023, she was sentenced to time served and restitution in the amount of $88,000.00. *See* Saidazim Mem. and Ord., ECF No. 315.

On March 31, 2023, Bishoff pled guilty to Count One of the First Superseding Indictment, charging him with conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349. There is no sentencing hearing scheduled for Bishoff at this time.

On February 26, 2024, Millett pled guilty to Counts One and Three of the Indictment. There is no sentencing hearing scheduled for Millett at this time.

On June 13, 2024, Alegria pled guilty to Counts One and Three of the Indictment pursuant to a written plea agreement. *See* Alegria Plea Agreement ¶ 1, ECF No. 358. There is no sentencing hearing scheduled for Alegria at this time.

On September 30, 2024, Santamaria pled guilty to Count One of the Indictment pursuant to a written plea agreement. *See* Santamaria Plea Agreement ¶ 1, ECF No. 375. He is scheduled to be sentenced on May 19, 2026. *See* Scheduling Ord., ECF No. 471.

On October 22, 2024, Ebady pled guilty to Count One of the Indictment. *See* Ebady Plea Agreement. ¶ 1, ECF No. 389. He is scheduled to be sentenced on May 6, 2026. *See* Scheduling Ord., ECF No. 462.

There has been no additional action in the case against Sutton since his arrest.

## II.    Legal Standard

Congress set forth the procedures for imposing a sentence in a criminal case in 18 U.S.C. § 3553. Together with 18 U.S.C. § 3553, the U.S. Federal Sentencing Guidelines (the "Sentencing Guidelines," or "Guidelines," or "U.S.S.G.") operate as the "starting point and . . . initial benchmark" for a court evaluating a criminal sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). If and when a trial court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state, in open court, the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form." *Id.* The court's statement of reasons "shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*,

08-CR-332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.) (internal citation omitted).

When determining the appropriate sentence, the Court must consider seven different factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentence range established by the Guidelines; (5) any pertinent policy statements issued by the U.S. Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. *See* 18 U.S.C. § 3553(a). The Court now addresses each factor in turn.

## III.  Analysis

### C.  The Nature and Circumstances of the Offense and the History and Characteristics of Defendant

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant[.]" 18 U.S.C. § 3553(a)(1).

#### 1.    *Family and Personal Background*

Defendant was born on November 23, 1992, in Los Angeles, California, to the marital union of his father, Vladimir Tsikman, and his mother, Polina Tsikman (née Voloshina). *See* PSR ¶ 60. Both Vladimir and Polina were born in Ukraine, but "immigrated to the United States together in September 1992, in search of better opportunities for their family." *Id.* ¶ 62. Defendant was born shortly after his parents immigrated to the United States and was raised by them in Los Angeles until he was sent to attend a boarding school in Monsey, New York, in 2007. *See id.* ¶¶ 62, 73; *see infra* Part III(A)(2). Defendant grew up in a Los Angeles community "heavily populated with other Russian families . . ." *Id.* ¶ 62. "Although their

7

financial circumstances were difficult in the beginning, [Defendant]'s basic needs were always met and, over time, their financial situation improved." *Id.*

Defendant has maintained "a good relationship with his mother[,] but described his relationship with his father as 'guarded'." *Id.* ¶ 60. "[Vladimir] was part of the military in Ukraine, which [Defendant] feels made his childhood 'unpleasant' as his father was very strict." *Id.* ¶ 62. For example, his father was often intoxicated and would, "hit [Defendant] as a form of punishment if [Defendant] or his brothers did not follow his instructions[.]" *Id.* Defendant "never reported this abuse . . . to anyone outside of the home[.]" *Id.*

Both Vladimir and Polina currently reside in Los Angeles. *Id.* ¶ 60. Vladimir is fifty-nine years of age and serves as a rabbi in their community. *Id.* Polina is fifty-four years of age and works as a Certified Public Accountant. *Id.* Both his parents suffer from chronic health conditions. *See id.* "[Defendant]'s parents are aware of the instant case and remain supportive." *Id.*

"[Defendant] has three siblings" whom "[he] shares good relationships with[,] . . . [and who] are aware of the instant case[,] and remain supportive." *Id.* ¶ 61. Dovid Tsikman is twenty-eight years of age and resides in Rancho Mirage, California, where he serves as a rabbi and works as a financial advisor. *See id.* Dovid "is married with one child." *Id.* Levi Tsikman is twenty-five years of age and resides in Los Angeles, California, where he works as an assistant social worker and is a rabbinical student. *See id.* Levi is presently married but has no children. *See id.* Dina Tsikman is fourteen years of age. *See id.* She "resides with [Defendant]'s parents" and is a full-time student. *Id.*

Defendant's long-term partner is thirty-one-year-old Michal Voldiner ("Voldiner"), whom "[he] has been in a relationship with . . . since 2017." *Id.* ¶ 63. "[Voldiner] resides with

8

[Defendant]" in Studio City, California, where she works as a Pharmacist. *Id.* ¶¶ 62–63, 70. Defendant reports Voldiner "experiences issues with her resting heart rate, sometimes causing her to faint." *Id.* ¶ 63. Voldiner's family similarly immigrated to the United States—but from Russia and Israel—when she was three years of age. *See id.* Defendant states Voldiner had to "grow up quickly to help care for her sister[]" in the wake of her parents' marital issues. *Id.* ¶ 63.

The couple share three children: Aiden Tsikman, age four, Layla Tsikman, age three, and Asher Tsikman, who is three months old. *See* Def.'s Mot. to File under Seal ("Def.'s Sent'g Mem.") at 9, ECF No. 476. The children reside with the couple, "attend daycare, and are in good health." PSR ¶ 63. Both parents "are very involved in the[ir] daily routines . . ." *Id.* However, Defendant reports "he likely spends more time with [the children] overall due to [Voldiner]'s work schedule." *Id.*

Voldiner describes Defendant "as a 'spectacular' father." *Id.* ¶ 64. She states "[Defendant] has always been involved in their community and is there to support their friends and family when needed." *Id.* "[Voldiner] is aware of the instant case and, while the case has made their relationship difficult, they are working through any problems together." *Id.* ¶ 63. She "was surprised to learn of [Defendant]'s involvement" because it was "out of character[,]" but she remains "fully supportive of [him] during this time." *Id.* ¶ 64. Moreover, Voldiner reports "[Defendant] has expressed sincere regret over how these actions have shaped himself and his family[,]" "wish[ing] he had no part in this conduct" to begin with. *Id.*

In addition to the above, the Court has considered Defendant's own letter and the letters of support his friends and family have submitted on his behalf. *See generally* Def.'s Sent'g Mem., Exs. 2–21; *see also* Def.'s Sent'g Mem. Supp., ECF Nos. 488.

2.    *Educational and Employment History*

Defendant reports first attending a Jewish private school in Los Angeles, California, from first through eighth grade. *Id.* ¶ 73. As previously mentioned, he was would later be sent to attend the boarding school Yeshivas Menachem Mendel Lubavitch of Monsey, New York, from 2007 to 2009. *See id.* Defendant "was ultimately expelled from this school due to behavioral issues related to his heavy drinking." *Id.*

Following his expulsion in 2009, Defendant attended Chabad Yeshiva, a boarding school in Buffalo, New York. *See id.* ¶ 74. He left Chabad Yeshiva in 2010 prior to obtaining his degree and did not report a reason for his departure. *See id.* However, Defendant later earned a general educational development certificate the same year and subsequently enrolled at Touro College in Los Angeles, California. *See id.* ¶ 75. Defendant attended the college part-time and studied business until he stopped attending in May 2012. *Id.* He did not receive a degree from the institution. *See id.*

Defendant's first record of employment was as a salesperson for LA Furniture Store from 2010 to 2013. *See id.* ¶ 79. "He could not recall his salary or the reason for leaving this position." *Id.*

From 2013 to 2015, Defendant was a salesperson for VIG Furniture. *See id.* Defendant earned between $29,311.00 and $48,491.00 annually in this role. *See id.* He did not report a reason for leaving this position. *See generally* PSR.

From 2015 to 2020, Defendant served as the President of Willshire Lending Group in Los Angeles, California. *See id.* ¶ 78. Defendant earned between $17,000.00 to $127,000.00 annually, which defense counsel asserts was an income determined by other individuals in the business. *See id.*

10

Defendant is also tied to several California companies during this time period which are connected to his prior state conviction in 2022 (the "California Conviction"). *See id.* ¶ 78. Outside of Willshire Lending Group, these entities "include[d] . . . Corona Pathology Lab, DDBS Enterprises Inc., DRT Marketing Services INC., and Genesis Molecular Diagnostics Inc." *Id.* Defendant's W-2 Earnings Summaries reflect approximately $469,780.20 earned over the entire five-year period. *See id* (adding together all earnings reported for each institution between 2015 and 2020). Defendant reports "he has not been involved with [these companies]" since his arrest for the California Conviction. *See id.*

Defendant is currently employed as an assistant to the Russian Jewish Community Cultural Center in West Hollywood, California. *See id.* ¶ 76. Defendant reported earning $72,000.00 annually. *See id.* "Most recently, he has been helping with the expansion of the center" which "serves as an adult day care center." *Id.* Otherwise, his regular responsibilities consist of "assisting in the coordination of client rides to and from the center and coordinating meals for each day." *Id.*

After reviewing Defendant's financial position, Probation concludes he "appears unable to pay a fine." *Id.* ¶ 8.

### 3.    *Prior Convictions*

The California Conviction is Defendant's one adult criminal conviction prior to the instant case. On May 28, 2020, Defendant was arrested for "engag[ing] in a conspiracy to cheat or defraud insurance companies of property, and to obtain money and property by false pretenses or false promises with the fraudulent intent to not perform those promises." *Id.* ¶ 53. With his fellow co-conspirators, Defendant "would prepare, aid and abet, or direct the preparation of fraudulent prescriptions for doctors to approve[]" and "prepared easy to complete prescription

11

pads for pain creams and durable medical equipment that could be submitted to various pharmacies." *Id.* "[I]t is estimated that insurance carriers were defrauded of $50,236,245.31 in the State of California[]" and "[t]he total attempted fraudulent billing was $75,347,943.02."[7] *Id.* The Santa Clara County Superior Court convicted Defendant of two counts of false and fraudulent claims against insurers, a felony. *See id.* Defendant was sentenced to 364 days' incarceration and fifty-four months of probation on December 16, 2022. *See id.* Probation was initiated at the time of sentencing and Defendant is expected to be discharged on June 16, 2027. *See id.*

### 4.    *Physical and Mental Health*

For approximately fifteen years, Defendant has experienced arthritis. *See id.* ¶ 67 Additionally, Defendant has been plagued with Tinnitus since he was ten years of age. *Id.* Moreover, Defendant reports chronic chest pain and fatigue due to four or five previous infections associated with Severe Acute Respiratory Syndrome, i.e., COVID-19. *See id.* A specialized bloodwork report indicated Defendant may have contracted an auto-immune disease from his post-COVID conditions as well. *See id.* ¶ 68. Defendant has been prescribed gabapentin and reports ongoing neurological tests. *See id.* ¶¶ 67–68.

"[Defendant] has been under the care of a mental health specialist . . ." throughout his period of pretrial supervision. *Id.* ¶ 69. "[Defendant] noted experienc[ing] symptoms of depression . . . prior to the instant offense" and further reports "he had developed a frequent gambling habit since the age of 18." *Id.* Defendant has not visited a casino or engaged in gambling since his pretrial release commenced given it is a required condition. *See id.*

---

[7] Defense counsel objects to this reported amount in the California Conviction, arguing it "[is] not substantiated by documents filed in, or discovery produced in . . . the case." Second Add. to PSR at 2. Probation made no amendments given "the information reflects that which was contained in documents provided by the Santa Clara County District Attorney's Office[.]" *Id.* at 3.

In addition to the above, the Court has considered the report prepared by Defendant's forensic psychiatrist addressing his mental health. *See* Def's Sent'g Mem., Ex. 3.

### 5. *Substance Abuse*

Defendant reports a history of substance abuse dating back to age eleven. *See* PSR ¶¶ 71–72. Defendant minimally engaged with marijuana in his teens and cocaine in his early twenties, but only with other people. *See id.* ¶ 71. Defendant also used opiates belonging to a family member in either 2017 or 2018, but only "after a prescription he had obtained for pain had run out." *Id.*

Defendant has a notable history of alcohol abuse. "[Defendant] began drinking alcohol at age 14 . . . and indicated that his consumption quickly became excessive . . ." *Id.* ¶ 72. Alcohol "became a part of his day-to-day" routine. *Id.*

In addition to the above, the Court has considered letters from the Aleph Institute, Lifeline Treatment Center, and Defendant's sponsor in Alcoholics Anonymous. *See generally* Def.'s Sent'g Mem.

### 6. *Nature and Circumstances of the Offense*

The Court's previous statements address the nature and circumstances surrounding the instant offense. *See supra* Part I.

## D. The Need for the Sentence Imposed

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant

13

with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]" 18 U.S.C. § 3553(a)(2).

The Court's sentence recognizes the seriousness of Defendant's conduct. "Fraud schemes like the one perpetrated in this case threaten the integrity of the American health care system." Gov't Sent'g Mem. at 16, ECF No. 485. "[Defendant] was a longstanding member of the conspiracy, with greater knowledge and control in the scheme than the average participant[,]" helping his co-conspirators expand the scheme to pharmacies nationwide and "wir[ing] millions of dollars in criminal proceeds from Scheme Pharmacies in the United States to money launderers in China." *Id.* at 4, 6.

The Court's sentence will deter Defendant and others from engaging in similar conduct, justly punish Defendant for his crimes, and protect the public from Defendant's actions. Accordingly, the Court's sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in this factor. 18 U.S.C. § 3553(a)(2).

### E. The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3). Defendant pled guilty to one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349. *See* Plea ¶ 1.

Defendant faces a maximum term of ten years' incarceration and no minimum term. 18 U.S.C. § 1347. Defendant also faces a maximum term of three years of supervised release. 18 U.S.C. §§ 3583(b)(2), 3559(a)(4). If a condition of release is violated, Defendant may be sentenced to up to two years of incarceration without credit for pre-release imprisonment or time previously served on post-release supervision. 18 U.S.C. § 3583(e). Defendant is eligible for a term of probation of one to five years. 18 U.S.C. § 3561(c)(1). Unless extraordinary

14

circumstances exist, the Court must impose one of the following as a condition of probation: a fine, restitution, or period of community service. 18 U.S.C. § 3563(a)(2).

**F. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offense**

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . [t]he applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" 18 U.S.C. § 3553(a)(4)(A).

The Government and Defendant stipulated to a Total Adjusted Offense Level of 35 in the Plea.[8] *See* Plea ¶ 2. However, Defendant now claims he did not stipulate to this estimated adjusted offense level. *See* Def.'s Sent'g Mem. at 19.

The applicable provision of the Guidelines is § 2X1.1, which directs the Court to apply the "base offense level for the substantive offense." U.S.S.G. § 2X1.1(a). Here, the Base Offense Level for the substantive offense—health care fraud—is found in U.S.S.G. § 2B1.1, which covers, *inter alia*, forms of theft. *See* U.S.S.G. § 2B1.1. Under U.S.S.G. § 2B1.1(a)(2), Defendant has a Base Offense Level of 6. *See id.*; PSR ¶ 40; Gov't Sent'g Mem. at 7; Def.'s Sent'g Mem. at 19; Plea ¶ 2.

The parties have varying opinions on whether certain adjustments should apply to Defendant.

First, the parties agree U.S.S.G. § 2B1.1(b)(2)(A)(i) adds 2 levels because the offense involved ten or more victims. U.S.S.G. § 2B1.1(b)(2)(A)(i); PSR ¶ 42; Gov't Sent'g Mem. at 7; Def.'s Sent'g Mem. at 19; Plea ¶ 2.

---

[8] The parties initially calculated a Subtotal Adjusted Offense Level of 38. *See* Plea ¶ 2. The Total Adjusted Offense Level the parties stipulated to is 35 because the Adjusted Offense Level was subject to a two-level reduction if Defendant "clearly demonstrated acceptance of responsibility," and a one-level reduction should Defendant "plead[] guilty on or before October 8, 2024." *Id.*

15

Second, the parties agree U.S.S.G. § 2B1.1(b)(10)(B) adds 2 levels because a substantial part of the fraudulent scheme was committed from outside the United States and involved sophisticated means. U.S.S.G. §§ 2B1.1(b)(10)(B), (b)(10)(C); PSR ¶ 43; Gov't Sent'g Mem. at 7; Def.'s Sent'g Mem. at 19; Plea ¶ 2.

However, the parties disagree on which adjustment should apply due to the amount of loss caused by Defendant's involvement in the scheme. The U.S. Probation Office ("Probation") and the Government agree U.S.S.G. § 2B1.1(b)(1)(O) adds 28 levels because the total loss stemming from Defendant's involvement in the offense—based on the Government's estimates and the Plea—was greater than $250,000,000.00, but less than $550,000,000.00.[9] U.S.S.G. § 2B1.1(b)(1)(O); PSR ¶ 41; Gov't Sent'g Mem. at 7; *see also* Plea ¶ 2.

Defendant objects to this adjustment by challenging the amount of loss calculated by the Government. *See supra* Part I n.5. Defendant reserved the right to challenge this loss amount in the Plea. *See* Plea ¶ 2; *see also* Def.'s Sent'g Mem. at 20. Defendant does not explicitly offer a loss amount for consideration, *see generally* Def.'s Sent'g Mem., but contends a "precise loss calculation is unnecessary" given how any Guidelines range calculated by the parties is subject to a ten-year statutory maximum, concluding "the Court need not resolve th[is] issue." *Id.* at 22.

Probation and the Government also agree certain mitigating factors should apply to Defendant. First, they agree a three-level reduction should apply for Defendant's timely

---

[9] Because the Court finds Defendant has a Criminal History Category of I, Probation encourages the Court to incorporate "the loss amounts from the California fraud (estimated in the PSR to be between $50 and $75 million) . . . into the instant [G]uideline computation with respect to the instant fraud." Third Add. to PSR at 1, ECF No. 492; *see infra* Part III(F). In response, Probation reports the Government's reluctance to similarly encourage this incorporation because "they do not have a preponderance of the evidence for the losses alleged . . ." and "are not in possession of a full list of victims . . . or the amounts that may be due to each one." *Id.*

acceptance of responsibility under U.S.S.G. §§ 3E1.1(a) and (b). U.S.S.G. §§ 3E1.1(a)–(b); PSR ¶¶ 49–50; Gov't Sent'g Mem. at 7; Plea ¶ 2.

Second, Probation and the Government agree a two-level reduction should apply because Defendant qualifies as a Zero-Point Offender pursuant to U.S.S.G. §§ 4C1.1(a) and (b). *See* U.S.S.G. §§ 4C1.1(a)–(b); Gov't Sent'g Mem. at 7 (diverting from the Plea to include Criminal History Category of I); Third Add. to PSR at 2, ECF No. 492 (modifying calculated Criminal History Category if the Court considers the California fraud as part of the instant). Defendant did not provide a calculation and therefore does not reference the mitigating factors adopted by the Government and Probation. *See* Def.'s Sent'g Mem. at 20.

Defendant's Criminal History Category is I despite a prior criminal conviction in 2022 (the "California Conviction"). *See* PSR ¶¶ 52–58. The California Conviction is not counted for the purpose of computing criminal history because it arises from the "same course of conduct" the instant offense. U.S.S.G. § 1B1.3(a)(2); Gov't Sent'g Mem. at 7; Third Add. to PSR at 1–2. Defendant agrees a Criminal History Category of I is appropriate, especially given he reserved his right to challenge this classification in the Plea. *See* Def.'s Sent'g Mem. at 20; *see also* Plea ¶ 2.

Probation and the Government agree, pursuant to the Guidelines Sentencing Table, a Total Adjusted Offense Level of 33 and a Criminal History Category of I results in a Guidelines range of 135 to 168 months' incarceration. U.S.S.G. § 5(A); Gov't Sent'g Mem. at 7; Third Add. to PSR ¶ 90. This Guidelines range is subject to a ten-year statutory maximum under 18 U.S.C. § 1347. *See* Plea ¶ 1(a).

Defendant did not provide a specific Guidelines calculation apart from agreeing and disagreeing with the application of certain adjustments. *See* Def's Sent'g Mem at 19–20.

17

Defendant does, however, offer an alternative view of his sentencing parameters, presenting the American Bar Association's "Shadow Guidelines" as a reference point for the Court. *See id.* at 24–25 (citing Am. Bar Ass'n Criminal Just. Section Task Force on the Reform of Fed. Sentencing for Econ. Crimes, A REPORT ON BEHALF OF THE AMERICAN BAR ASSOCIATION TASK FORCE ON THE REFORM OF FEDERAL SENTENCING FOR ECONOMIC CRIMES (Final Draft, Nov. 10, 2014) [hereinafter "Shadow Guidelines"]). Pursuant to the Shadow Guidelines, Defendant calculated a Total Adjusted Offense Level of 15, which results in a Guidelines range of eighteen (18) to twenty-four (24) months' incarceration under a Criminal History Category of I, or twenty-one (21) to twenty-seven (27) months' incarceration under a Criminal History Category of II. *Id.* at 25 (determined after applying the three-level reduction for acceptance of responsibility); U.S.S.G. § 5(A).

This Court appreciates the sentencing arguments raised by all parties and has seriously considered each in turn.

### G. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5).

As previously mentioned, Defendant draws the Court's attention to the ABA's Shadow Guidelines. According to Defendant, the Court should instead consider his Total Adjusted Offense Level to be 15. *See* Def.'s Sent'g Mem. at 24–25 (Determined after applying the three-level reduction for acceptance of responsibility). Defendant asserts the 2014 proposals "were drafted in response to rising concern that the Sentencing Guidelines' rigid focus on loss amounts minimized judicial discretion when it came to economic offenses." *Id.* at 24. However, Defendant insists he "does not submit this discussion . . . to argue that the Court is in any way

18

bound by them[,]" but instead to "provide a reference point[.]" *Id.* at 25. Under the Shadow Guidelines, Defendant calculates a Base Offense Level of 6, a fourteen-level enhancement for victim loss of more than $50 million, a two-level enhancement given the "low victim impact" in this action, and a four-level reduction due to Defendant's "low culpability." *Id.* (citing Shadow Guidelines at 2).

In response, the Government urges the Court to disregard Defendant's invocation of the Shadow Guidelines, asserting "[Defendant] must be sentenced under the law as it is," not by guidelines "created without input by the Sentencing Commission or Congress by a committee of practitioners including defense attorneys." Gov't Sent'g Mem. at 10. Even if the Court were to consider applying the calculations found in the Shadow Guidelines, the Government recommends the Court strike the four-point reduction for "low culpability" and include a four-level enhancement for victim impact, rather than the two-level enhancement recommended by Defendant. *Id.* Applying these changes, the Government calculates a Total Adjusted Offense Level of 21 under the Shadow Guidelines, not 15. *See id.* at 10–11 (determined after applying the three-level reduction for acceptance of responsibility).

The Court acknowledges the parties' arguments, their underlying rationale and policy. However, in this case, the Court will apply the Guidelines as articulated by the U.S. Sentencing Commission.

The parties have not drawn the Court's attention to any other applicable policy statements. Finding no others on its own, the Court proceeds to the next § 3553(a) factor.

19

**H. The Need to Avoid Unwarranted Sentence Disparities**

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"  18 U.S.C. § 3553(a)(6).

Defendant raises an argument regarding unwarranted sentencing disparities in this case, arguing his sentence should be "aligned with that imposed on his co-defendant[.]"  Def.'s Sent'g Mem. at 2.  Asserting he is less culpable, Defendant argues his compensation from the scheme was "aligned with those of" Saidazim, who was one of many people that "gave him instructions[.]"  *Id.* at 13, 16.

The Government disagrees, arguing "the Court must fashion a sentence that avoids unwarranted sentencing disparities among similarly situated defendants nationwide, not merely with respect to two co-defendants."  Gov't Sent'g Mem. at 17 (citing *Untied States v. Stewart*, No. 23-CR-6330, 2024 WL 3517853, at *2 (2d Cir. Jul. 24, 2024)).  Even so, the Government distinguishes Defendant from Saidazim, noting they "are not even remotely situated[]" because they differ with respect to: (1) when they became involved in the scheme; (2) their knowledge of whether the company was engaging in criminal conduct when they joined; (3) their mitigating factors; and (4) their levels of compensation from the fraudulent scheme.  *Id.* at 17–18.

The Court has reviewed and considered carefully the parties' arguments.  For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

**I.  The Need to Provide Restitution**

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense."  18 U.S.C. § 3553(a)(7).

20

Pursuant to the Plea, Defendant agreed to a Restitution Order "in the full amount of each victim's losses as determined by the Court" consistent with 18 U.S.C. §§ 3663A and 3664.  Plea ¶ 1(e).  Probation originally reported the Government calculated the victims' known losses at an amount of $535,772,945.80.  *See* PSR ¶ 36.  Defendant objected to this estimate.  *See* Second Add. to PSR at 1; *see also* Def.'s Sent'g Mem. at 20–21.  The Government later corrected this estimate, reporting Defendant is liable for $376,829,509.34 in restitution and reserving its right to submit a proposed Order within ninety days of sentencing.  Gov't Sent'g Mem. at 18.

In addition to the above, Probation believes the victims from the [California Conviction] should be afforded the opportunity to request restitution as well as provide victim impact statements" should the Court find Defendant has a Criminal History Category of I.  Third Add. to PSR at 1, ECF No. 492.

As of the time of sentencing, no responses have been received regarding victim losses.  The Court reserves its right, pursuant to 18 U.S.C. § 3664(d)(5), to hold an evidentiary hearing within ninety days after sentencing to determine the specific amounts owed to Defendant's victims.  The Court will issue a Final Order of Restitution accordingly.

**IV.   Conclusion**

For the reasons set forth above, the Court sentences Defendant to 120 months' incarceration; two (2) years of supervised release with both the standard and special conditions of supervision; restitution as set forth in the forthcoming Order of Restitution; and a $100.00 mandatory special assessment.  This sentence is sufficient, but not greater than necessary, to accomplish the purposes of § 3553(a).  The Court does not impose a fine given Defendant's present financial circumstances.

The Court expressly adopts the factual findings of the PSR and addenda thereto, as corrected herein, to the extent those findings are not inconsistent with this opinion. The Court advises Defendant he has fourteen (14) days to appeal the order and judgment of this court from the date the order and judgment are entered.

SO ORDERED.

s/WFK
HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: May 8, 2026
        Brooklyn, New York

22